UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSEPH WILLIAM DOBBS, SR., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   2:17-cv-00765-HNJ |
| | ) | |
| COMMISSIONER, SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant | ) | |

## **MEMORANDUM OPINION**

Plaintiff Joseph William Dobbs, Sr., seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Secretary"), regarding his claim for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).  The undersigned has carefully considered the record, and for the reasons stated below, **AFFIRMS** the Commissioner's decision.

## LAW AND STANDARD OF REVIEW

To qualify for disability benefits and establish entitlement for a period of disability, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder. The Regulations[1] define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520. The burden rests upon the claimant on

---

[1] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499. Although the Social Security Administration amended the regulations effective January 17, 2017, the amendment applies only to Social Security applications filed after the effective date, March 27, 2017. *Watkins v. Berryhill*, No. 7:16-CV-242-FL, 2017 WL 3574450, at *4 (E.D.N.C. Aug. 1, 2017), *report and recommendation adopted*, No. 7:16-CV-242-FL, 2017 WL 3568406 (E.D.N.C. Aug. 17, 2017); *Jordan v. Commissioner of Social Security*, 2017 WL 3034386 (N.D. Ohio July 18, 2017) (applying version of Listing 12.05(C) in effect at time of ALJ's decision, but finding error in ALJ analysis and remanding for new hearing and analysis under new version). Accordingly, the undersigned relies upon the prior versions in effect at the time of the ALJ's decision.

the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00–114.02. 20 C.F.R. § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairments would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if they suffer from a listed impairment. *See Jones*, 190 F.3d at 1228 ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step where

the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the plaintiff has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant is successful at the preceding step, the fifth step shifts the burden to the Commissioner to prove, considering claimant's RFC, age, education and past work experience, whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520(f)(1). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also* 20 C.F.R. § 404.1520(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. § 404.1520(a)(4)(v), (g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Social Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the

decision reached is reasonable and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Mr. Dobbs protectively filed an application for SSI and DIB on November 12, 2013, alleging disability beginning September 30, 2013. (Tr. 208). The Commissioner denied his claims, and Dobbs timely filed a request for a hearing on February 24, 2014. (Tr. 125-26). The Administrative Law Judge ("ALJ") held a hearing on September 10, 2015. (Tr. 38-81). The ALJ issued an opinion denying Dobbs's claim on December 28, 2015. (Tr. 17-32).

Applying the five-step sequential process, the ALJ found at step one that Mr. Dobbs had not engaged in substantial gainful activity since September 30, 2013. (Tr. 22). At step two, the ALJ found the following severe impairments: asthma; mood disorder; major depressive disorder, recurrent, severe, without psychotic features;

partial complex epilepsy; arthralgias in multiple joints; and history of alcohol dependence. (Tr. 22). At step three, the ALJ found that Mr. Dobbs's impairments, or combination of impairments, did not meet or equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 23).

Next, the ALJ found that Mr. Dobbs exhibited the residual functional capacity ("RFC") to perform light work with the following non-exertional limitations: the claimant would require a sit/stand option with the retained ability to stay on or at a workstation in no less than 30 minute increments each without significant reduction of remaining on task; the claimant is able to ambulate short distances up to 1 city block per instance on flat, hard surfaces; the claimant is able to frequently use foot controls bilaterally; the claimant can occasionally climb ramps and stairs but never climb ladders or scaffolds; the claimant can frequently stoop and crawl; the claimant should work in close proximity to coworkers or supervisors in order to be under observation to monitor potential unplanned seizure activity; the claimant should never be exposed to unprotected heights, dangerous machinery, dangerous tools, hazardous processes, or operate commercial motor vehicles; the claimant should be exposed to no more than moderate noise levels; the claimant could only remember short, simple instructions and would be unable to deal with detailed or complex instructions; the claimant could do simple, routine, repetitive tasks but would be unable to do detailed or complex tasks; the claimant is limited to making simple work-related decisions; the claimant should have

no more than occasional interaction with the general public but could have frequent interaction with coworkers and supervisors; the claimant would be able to accept constructive, non-confrontational criticism, work in small group settings, and be able to accept changes in the workplace setting if introduced gradually and infrequently; the claimant would be unable to perform assembly-line work with production rate pace but could perform other goal-oriented work; in addition to normal workday breaks, the claimant would be off-task 5 percent of an 8-hour workday (non-consecutive minutes). (Tr. 27-28).

At step four, the ALJ determined that Dobbs cannot perform his past relevant work as a forklift operator. (Tr. 30). At step five, based on the testimony of a vocational expert, the ALJ determined that, considering Mr. Dobbs's age, education, work experience, and RFC, a significant number of other jobs exist in the national economy that Mr. Dobbs could perform, including ticket marker and courier within a building. (Tr. 31). Accordingly, the ALJ determined that Mr. Dobbs has not been under a disability, as defined by the Social Security Act, since September 30, 2013. (Tr. 32).

Mr. Dobbs timely requested review of the ALJ's decision. (Tr. 16). On March 10, 2017, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. Mr. Dobbs filed his complaint with the court seeking review of the ALJ's decision. (Doc. 1).

# ANALYSIS

In this appeal, Mr. Dobbs argues (1) the ALJ's Step 3 determination lacks support in substantial evidence because he failed to consider Listing 11.03; (2) the ALJ's Step 3 determination that Plaintiff does not meet Listing 12.04 lacks support in substantial evidence because the ALJ improperly rejected Dr. Richard Diethelm's opinion; and (3) the ALJ's Step 5 determination is not supported by substantial evidence because the jobs identified by the Vocational Expert are inconsistent with the RFC. The court finds Plaintiff's assertions do not merit reversal.

## I.     The ALJ Did Not Err in the Consideration of Listing 11.03

Dobbs first claims the ALJ erred in failing to assess his seizure disorder under Listing 11.03, despite finding partial complex epilepsy as a severe impairment. The court finds the ALJ properly considered the requirements of Listing 11.03, without specifically mentioning the listing, and his decision has support in substantial evidence.

Listing 11.00 reads, in pertinent part, as follows:

A. Epilepsy.   In epilepsy, regardless of etiology, degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures.   At least one detailed description of a typical seizure is required. Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena.   The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information.   Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken. When seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels. Should serum drug levels appear therapeutically inadequate, consideration should be given as to whether this is caused by individual idiosyncrasy in absorption of metabolism of the drug. Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance. When the reported blood drug levels are low, therefore, the information obtained from the treating source should include the physician's statement as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels. Where adequate seizure control is obtained only with unusually large doses, the possibility of impairment resulting from the side effects of this medication must be also assessed. Where documentation shows that use of alcohol or drugs affects adherence to prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.00.[2]  Listing 11.03 reads:

Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

---

[2] Available at
https://www.gpo.gov/fdsys/pkg/CFR-2012-title20-vol2/pdf/CFR-2012-title20-vol2-part404-subpartP-app1.pdf

While the ALJ did not specifically mention Listing 11.03, his opinion manifests he indeed considered the listing and evaluated the evidence in accordance with the listing's requirements. He noted Dobbs experienced seizures accompanied by right-sided weakness, loss of consciousness, incontinence, and slurred speech. (Tr. 29). However, the ALJ specifically noted Dobbs responded to anti-seizure medication, such that by the time of the hearing, Dobbs testified he had not had any seizures in the five weeks preceding the hearing. (Tr. 29, 55). Thus, Dobbs's seizures did not meet the criteria because they were not occurring at least once per week during three months of prescribed treatment. The ALJ also noted that a blood test showed less than therapeutic levels of anti-seizure medication at the beginning of Dobbs's January 2014 hospital stay. (Tr. 29).

The ALJ further cited normal diagnostic test results and the lack of any follow up treatment records portraying further seizure-like episodes, suggesting medication controls the complex partial epilepsy. (Tr. 29). Thus, the ALJ did not err by failing to mention Listing 11.03 by name, when the opinion establishes he conducted the required review. *See Anteau v. Comm'r of Soc. Sec.*, 708 F. App'x 611, 614 (11th Cir. 2017) (even though ALJ failed to mention a disorder and specific listing in his decision, the ALJ's determination that claimant's diagnosis did not meet listing was implicit in the ALJ's determination that claimant had the RFC to perform past relevant work; ALJ would only have reached that determination by first determining that claimant had no severe

10

impairment that met or equaled a listed impairment); *Flemming v. Comm'r of the Soc. Sec. Admin.*, 635 F. App'x 673, 676 (11th Cir. 2015) (ALJ's failure to discuss listings at step three does not necessarily show the ALJ did not consider those listings; Eleventh Circuit does not require an ALJ to "mechanically recite" the evidence or listings considered and the court may infer from the record that the ALJ implicitly considered and found a claimant's disability did not meet a listing); *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986) ("There may be an implied finding that a claimant does not meet a listing" when the ALJ proceeds to the fourth and fifth steps of the disability analysis.).

In addition, the ALJ's determination that Dobbs fails to meet Listing 11.03 has support in substantial evidence. Dobbs's medical records reflect he first reported seizure activity to medical care providers on October 18, 2013. (Tr. 275). Dobbs related he left work due to dizziness and nausea and went to bed; his wife reported when he awoke, he stared and his right hand and arm shook. (Tr. 275). Dobbs averred he had experienced several similar, but not as severe, episodes in the previous six months. (Tr. 276). By the time Dobbs sought treatment at Brookwood Medical Center for the October 18 episode, his symptoms had resolved. A CT scan of his head and a magnetic resonance angiogram of his neck yielded normal results. (Tr. 271, 275, 282, 283). An October 19, 2013, magnetic resonance angiogram of Dobbs's head displayed normal except for luminal irregularities in the cortical branches, suggestive of

11

small vessel disease.  (Tr. 267, 282).  A brain MRI performed the same day displayed negative for acute infarction, hemorrhagic or calcified lesions, and parenchymal or meningeal lesions; only a few, scattered, non-specific white matter lesions appeared on the imaging, probably due to microvascular angiopathy.  (Tr. 269).  By October 20, 2013, Dobbs improved and experienced no further episodes.  Dr. Camilo Gomez diagnosed partial complex seizures and anxiety.   (Tr. 278).

Dobbs entered UAB on November 1, 2013, complaining of moderate right side weakness for the previous two weeks, worsening, and slurred speech beginning that morning.  According to his wife, Dobbs's episodes manifested with jerking of all extremities for approximately two minutes, multiple times a day.  (Tr. 323, 329).  She denied Dobbs exhibited incontinence or tongue biting.  (Tr. 329).  Upon examination, he displayed as alert and oriented, yet confused as to the situation.  (Tr. 324, 330).  He exhibited 4/5 strength and slurred speech upon admission, yet he had clear and coherent speech later in the day.  (Tr. 324, 330).  A head CT scan exhibited no intracranial hemorrhage or acute infarction, and an MRI displayed negative results. (Tr. 324, 329, 335-36).

Dr. Camilo Gomez saw Dobbs on November 7, 2013, and Dobbs reported he had experienced several additional seizure events resulting in loss of consciousness and urinary incontinence.  (Tr. 286).  However, Dobbs exhibited no apparent distress, and was awake, alert, and displayed a normal gait.  Dobbs reported he felt good and he had

a normal physical examination. (Tr. 287, 290, 291). Dr. Gomez believed psychotropic medication Dobbs received from another doctor had exacerbated his problems, so he discontinued the medication. (Tr. 287, 344). However, during his visit with Dr. Gomez, Dobbs experienced a seizure and Dr. Gomez sent him to the hospital. (Tr. 293, 343). While in the hospital, Dobbs informed Dr. Mary Dodson of almost daily seizures or syncope activity; however, he had a normal physical examination. (Tr. 293).

Dobbs followed up with Dr. Gomez on December 3, 2013. He reported doing better and going multiple days without seizures; however, he did experience one seizure after getting upset. (Tr. 371). Dr. Gomez noted Dobbs tolerated his medications well, displayed as awake and alert, and ambulated normally without instability. (Tr. 371-72). Dr. Gomez increased Dobbs's anti-seizure medication (Depakote), opined he could not return to work until the seizures were well-controlled, and scheduled a follow-up appointment four weeks later. (Tr. 372).

On January 3, 2014, Dobbs presented to St. Vincent's emergency room after suffering a seizure lasting less than one minute with urinary incontinence. He hit his forehead and his wife reported he suffered three more seizures after that event. He displayed as lethargic, oriented, cooperative, and with no muscle weakness in his grip, yet non-verbal. (Tr. 386-88). St. Vincent's East Hospital admitted Dobbs from the emergency room after he experienced another seizure in the emergency room; he also

13

had a seizure upon arrival for admission. (Tr. 402). A head CT scan displayed normal except for a sinus infection, and an MRI portrayed no acute disease. (Tr. 394, 401, 419, 424). Dobbs's EEG exhibited normal results, with no focal lateralized or epileptiform artifacts, yet the doctors could not rule out convulsive disorder. (Tr. 413). Dr. Diethelm treated Dobbs during his hospital stay and increased his Depakote further, after blood tests revealed Dobbs had less than a therapeutic dosage in his system. (Tr. 403). The hospital discharged Dobbs in good condition. (Tr. 400-01).

Dobbs sought treatment at Brookwood Medical Center on June 21, 2014, for chest pains after he discontinued Paxil on his own. At that time, his Depakote levels tested low, but he was not having seizures. Dr. Rick Phillips treated him with Ativan with good result. (Tr. 515). By February 12, 2015, records reflect Dobbs's anti-seizure medications included Depakote, Klonopin, and Vimpat. (Tr. 451). The record contains no further notations of treatment for seizures after January 2014, apart from medication refills and Dr. Diethelm's Seizure Residual Functional Capacity Questionnaire, in which he stated Dobbs reported seizures on March 10, 11, and 12, 2014.

Dr. Diethelm completed a Seizure Residual Functional Capacity Questionnaire on April 15, 2014. (Tr. 436-38). On April 24, 2014, Dr. Diethelm completed a Residual Functional Capacity Questionnaire. (Tr. 441-42).

Dr. Diethelm reported Dobbs experienced complex partial seizures, without warning, approximately 10 times per month, lasting one-and-a-half to three minutes each, and had experienced seizures on March 10, 11, and 12, 2014. After each seizure, Dobbs exhibited confusion and severe headaches for one to two hours. (Tr. 436). He identified stress and emotional distress as triggers for seizures. Dr. Diethelm stated the anti-seizure medication failed to improve Dobbs's symptoms, despite Dobbs's compliance, and the medication could cause side effects of eye focus problems, lethargy, coordination disturbance, and lack of alertness. (Tr. 437, 441).[3] Dr. Diethelm opined Dobbs's seizures would disrupt co-workers and require supervision. (Tr. 437). He also stated Dobbs's symptoms of head pain, weakness, fatigue, memory loss, and confusion would constantly interfere with his ability to perform simple, work-related tasks. (Tr. 441). He limited Dobbs to lifting no more than 10 pounds occasionally, walking one block at a time, sitting for one hour at a time for four hours in a work day, and standing ten minutes at a time for less than two hours in a work day. (Tr. 438, 441-42). He found no limitation in Dobbs's ability to reach, handle, and finger. (Tr. 441). Dr. Diethlem also opined Dobbs would need unscheduled breaks every hour for 15 minutes and would miss work more than four times a month. (Tr. 437, 441-42).

---

[3] The record reflects Dobbs denied medication side effects on August 3, 2015. (Tr. 487).

The other medical records, reviewed previously, do not comport with Dr. Diethelm's opinion, and furthermore Dr. Diethelm treated Dobbs for only a brief period. Therefore, the ALJ correctly rejected Dr. Diethelm's opinion in assessing Dobbs's seizure disorder and finding it not disabling for a period of at least 12 months. Substantial evidence buttresses the ALJ's decision finding medication sufficiently controls Dobbs's seizures such that he does not experience them more than once weekly.

## II.    The ALJ Correctly Weighed Dr. Diethelm's Opinion in Finding Dobbs Fails to Meet Listing 12.04

Dobbs contends the ALJ erred in giving little weight to his treating physician's opinion and thus erred in failing to find his mood disorder and major depressive disorder disabling.

With regard to treating physicians, the ALJ must give "substantial or considerable weight" to the opinion of a treating physician "unless 'good cause' is shown." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). Good cause exists when: (1) the evidence did not bolster the treating physician's opinion; (2) evidence supported a contrary finding; or (3) a treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Id.* An ALJ must clearly articulate the reasons for affording less weight to a treating physician's opinions. *Id.* An ALJ does not

commit reversible error when one, he articulates specific reasons for declining to give the treating physician's opinion controlling weight, and two, substantial evidence supports these findings. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (*per curiam*).

To determine the weight given to a medical opinion, an ALJ must consider several factors, including the examining relationship, the treatment relationship, the evidence presented to support the opinion, the consistency of the opinion with other evidence, and the specialization of the medical professional. 20 C.F.R. §404.1527(c); *see Davis v. Comm'r of Soc. Sec.*, 449 F. App'x 828, 832 (11th Cir. 2011) (stating that the ALJ will give more weight to the medical opinions of a source who has examined the plaintiff, and opinions supported by medical signs, findings, and consistency with the overall "record as a whole"). The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)). However, the ALJ must "state with at least some measure of clarity the grounds for his decision." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). This measure of clarity requires the ALJ to state the weight given to each medical opinion and the reason therefor. *Id.*

To meet the requirements of a Listing, Dobbs must "have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R.

§ 404.1525(d).   The Listings of Impairments in the Social Security Regulations identify impairments so severe as to prevent a person from engaging in gainful activity.   *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.   If the claimant claims an impairment that equals a listed impairment, the claimant must present evidence that describes how the impairment possesses such an equivalency.   *Armstrong v. Comm'r of Soc. Sec.*, 546 F. App'x 891, 894 (11th Cir. 2013) (citing *Wilkinson ex rel. Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987)).   If Dobbs meets a listed impairment or otherwise establishes an equivalence, the regulations conclusively presume a disability.   *See* 20 C.F.R. § 416.920(d).   If an impairment manifests only some of the criteria, then it does not qualify, no matter how severe the impairment.   *Nichols v. Comm'r of Soc. Sec.*, 679 F. App'x 792, 795 (11th Cir. 2017) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

At step three, the ALJ concluded that Dobbs's impairments do not meet the criteria for Listing 12.04.   (Tr. 24-25).   Listing 12.04 establishes the criteria for affective disorders, 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, §12.04.   In relevant part, Listing 12.04 states:

> **Affective Disorders.**   Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.   Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

18

A. Medically documented persistence, either continuous or intermittent, of one of the following:
    1. Depressive syndrome, characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions, or paranoid thinking; or

* * *

AND

B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning;
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration

*Id.*

Thus, the paragraph B criteria require a claimant to have at least two of the following: marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended

duration. *Id.* § 12.04(B). "Marked" means "more than moderate but less than extreme;" marked restriction occurs when the degree of limitation seriously interferes with a claimant's ability to function "independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00(C); *see also* 20 C.F.R. § 416.920a(c)(4) (describing a five-point scale used to rate the degree of limitation: none, mild, moderate, marked, and extreme). "Episodes of decompensation" reflect "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4). To meet the criterion of "repeated" episodes of "extended duration," a claimant must have three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id.*

As regards the paragraph 12.04(C) criteria, the listing requires a medically documented history of the alleged mental disorder "of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," as well as one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process resulting in "such marginal adjustment" that it is predicted that "even a minimal increase in mental demands or change in the environment" would cause decompensation; or (3) a current history of at least one

year's "inability to function outside a highly supportive living arrangement," with an indication that this arrangement needs to continue. *Id.* § 12.04(C).

Dr. Diethelm, a neurologist, treated Dobbs from January 3 to 5, 2014. There is some indication in the record he saw Dobbs at a six-week follow up appointment (Tr. 436, 511); however, no treatment notes from a later date appear in the record. In a Mental Capacity Assessment completed April 15, 2014, Dr. Diethelm opined that as a result of epilepsy and attendant concentration and memory loss, irritability, and depression, Dobbs displayed extreme limitations in the ability to complete a normal workday or workweek without interruptions from psychologically based symptoms, as well as in the ability to interact appropriately with the general public. (Tr. 446).

Dr. Diethelm rated Dobbs with marked limitations in the ability to remember locations and work-like procedures; understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without distraction; make simple, work-related decisions; perform at a consistent pace; ask simple questions or request assistance; accept instruction and respond appropriately to supervisors' criticism; and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 445-46).

Dr. Diethelm ascribed moderate limitations in Dobbs's ability to understand and remember short and simple instructions; carry out detailed instructions; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions.  (Tr. 445-47).

Finally, Dr. Diethelm opined Dobbs portrayed slight limitations in the ability to carry out short and simple instructions; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (Tr. 445, 447).  Dr. Diethelm also expressed Dobbs possessed the capability to manage benefits. (Tr. 447).[4]

The ALJ gave Dr. Diethelm's opinion little weight.  (Tr. 30).  As grounds, he cited the brief period during which Dr. Diethelm treated Dobbs, as well as inconsistency between the doctor's opinion and the other record evidence. Specifically, the ALJ found his opinions lacked support in corroborating treatment records and lacked consistency with records demonstrating Dobbs did not experience further seizure-like activity after his discharge from the hospital on January 5, 2014. (Tr. 30). In fact, the ALJ noted Dobbs failed to follow up with Dr. Diethelm after his discharge, and no medical records document additional seizures after January 5, 2014,

_____

[4] This opinion stands in sharp contrast to the opinions of Dobbs and Dobbs's wife, both of whom stated in function reports that Dobbs cannot pay bills or handle a checkbook or savings account due to forgetfulness.  (Tr. 219, 227).

leading the ALJ to conclude medication controls his complex partial epilepsy.[5] (Tr. 29). The ALJ rejected Dr. Diethelm's Mental Capacity Assessment as inconsistent with treating source records reflecting only moderate symptoms, and, moreover, Dobbs's mental RFC assessment did not fall within his specialty (neurology). (Tr. 30).

The ALJ found Dobbs exhibits mild restriction in activities of daily living. (Tr. 24). He based this finding on Dobbs's testimony that he lives alone, has no problems with personal care and hygiene, prepares simple meals, drives to the store, and shops for medicine and food once or twice a week.

The ALJ ascribed moderate restriction in social functioning. (Tr. 24-25). He noted Dobbs spends time with others and sees his wife or son on their daily visits. He frequently spends time visiting with his grandchildren and attends church three times a week. Dobbs testified he experiences difficulty getting along with family, friends, neighbors, authority figures, and others because he feels they watch the way he speaks or walks; however, he also testified he loves to talk with other people and gets along well with others.

The ALJ determined Dobbs exhibits mild difficulties with concentration, persistence, or pace. (Tr. 25). Dobbs testified he can pay attention for only short periods of time and does not finish things he starts. He also reported inability to

---

[5] Dr. Diethelm wrote in his Seizure Residual Functional Capacity Questionnaire that Dobbs reported additional seizures on March 10, 11, and 12, 2014; however, the record contains no records reflecting treatment for seizures after January 2014, apart from medication.

follow written instructions and difficulty with spoken instructions, as well as impediments in handling stress and changes in routine. Yet, treating source psychiatric records reflect Dobbs exhibits a "satisfactory" attention span and intact memory, attention, and concentration. (Tr. 364).

The ALJ also found Dobbs experienced no episodes of decompensation of extended duration. (Tr. 25). He also has no diagnosis of any residual disease process which would cause decompensation with only minimal increases in mental demands. The ALJ noted Dobbs did not require a highly supportive living environment and has not displayed an inability to function outside of his home. (Tr. 25).

The ALJ cited the opinion of treating psychiatrist Dr. Dieter Bartschat, who diagnosed Dobbs with mood disorder secondary to a medical condition. (Tr. 27, 364). Dr. Bartschat observed Dobbs behaved in a friendly and engageable manner; dressed appropriately; denied delusions, hallucinations, or suicidal or homicidal ideation; and displayed full orientation and appropriate and congruent affect, despite reporting depression and anxeity. (Tr. 364). He assessed Dobbs with a GAF of 55, indicating moderate symptoms or difficulty in social or occupational functioning.[6] (Tr. 364).

Dobbs received treatment at Brookwood Medical Center commencing June 10, 2014, for a possible overdose after family members reported Dobbs ingested an

---

[6] A Global Assessment of Functionality (GAF) score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000). A GAF score of 51–60 indicates moderate impairments. *Id.* at 34.

unknown amount of Klonopin; Dobbs remarked he only drank a large amount of alcohol. Toxicological testing exhibited no evidence Dobbs ingested Klonopin or other such medication, despite his report he took his medicine as prescribed. (Tr. 522). Dobbs conveyed at that time his sleep, appetite, and energy were good, and he denied feeling suicidal, hopeless, helpless, or worthless. (Tr. 522-23). Dr. Misty Ary diagnosed depressive disorder and alcohol dependence. (Tr. 521). By the time of his discharge on June 17, 2014, Dobbs exhibited a euthymic mood and congruent affect, with no activity restrictions imposed. (Tr. 521, 526).

After discharge, Dobbs sought mental health treatment at Chilton Shelby Mental Health Center starting June 23, 2014. (Tr. 501-09). He received diagnoses of major depressive disorder, recurrent, severe, without psychotic features, and alcohol abuse. (Tr. 508). On September 8, 2014, Dobbs exhibited appropriate grooming, good eye contact, no orientation or remote memory deficits, sad mood, blunted affect, and poor insight and judgment. (Tr. 498-99). By October 20, 2014, he reported doing relatively well, other than occasional difficulty with sleep. He displayed no deficits in orientation, recent memory, or remote memory, a euthymic mood, and fair insight and judgment. (Tr. 495). Dobbs's next visit on March 23, 2015, reflected no deficits in orientation, recent memory, or remote memory, yet a depressed affect and poor insight and judgment. (Tr. 492-93). By June 22, 2015, his orientation, recent memory, and remote memory remained intact, yet he displayed a depressed mood, and fair insight

and judgment after extreme relationship difficulties and increased alcohol consumption. (Tr. 489-90). Additional treatment records portray Dobbs's depression relatively well-controlled with medication. (19F, 20F).

After a visit to Quality of Life Health Services on February 12, 2015, Dr. Stacy Moore's notes reflect Dobbs denied difficulty concentrating, excessive worry, hopelessness, impaired judgment, or anhedonia. Therefore, medication sufficiently controlled Dobbs's depression. (Tr. 453, 455). Dobbs's depression had worsened by June 22, 2015, due to relationship difficulties, manifesting as anger with increased alcohol consumption. (Tr. 489). He nonetheless displayed appropriate attention, goal-directed and appropriate thought content, and fair insight and judgment. (Tr. 489-90).

Grandview Medical Center admitted Dobbs for inpatient psychiatric treatment on December 17, 2015. Upon discharge the following day, Dr. Davis Harvey noted Dobbs displayed as "much improved." (Tr. 598). Dr. Harvey recommended Dobbs follow up with his local mental health care provider; however, the record contains no further notes of treatment.

The ALJ accorded substantial weight to the opinions of consulting psychologist Dr. Steven Dobbs and consulting physician Dr. Krishna Reddy. (Tr. 29, 30). Dr. Reddy opined Dobbs's affective disorder would cause mild restrictions in activities of daily living, moderate difficulties in social functioning, and mild difficulties with

maintaining concentration, persistence, and pace. She discerned no repeated episodes of decompensation for extended duration. (Tr. 91). She cited medical records establishing Dobbs exhibited logical thoughts, satisfactory attention, and undisturbed memory. (Tr. 91). Dr. Reddy also determined Dobbs's seizures would improve over time with continued medical care and compliance. (Tr. 94).

Dr. Dobbs opined Dobbs displays no understanding and memory limitations, and no sustained concentration and persistence limitations. (Tr. 95). He assessed Dobbs with moderate limitations on his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers without distracting them or exhibiting behavioral extremes. (Tr. 95). Dr. Dobbs found no significant limitations on Dobbs's ability to ask simple questions or request assistance, or maintain socially appropriate behavior and hygiene. (Tr. 95-96).

The ALJ relied in part on the inconsistency between Dr. Diethelm's opinion that Dobbs exhibited severe or marked limitations and the records from other treating sources finding he exhibited, at most, moderate limitations. He also cited Dr. Diethelm's lack of specialization in psychiatry as a reason for according little weight to his opinion. *See* 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a medical specialist."); *Brown v. Comm'r of Soc. Sec.*, 425

F. App'x 813, 818-19 (11th Cir. 2011) (psychologist's opinion that claimant was unable to work due to physical problems properly given little weight). Having given specific and well-supported reasoning for giving Dr. Diethelm's opinion little weight, the ALJ's opinion rests upon substantial evidence.

## III.    The ALJ Did Not Err in Accepting the VE's Testimony

Dobbs contends his assigned RFC does not correspond to the job descriptions for the jobs identified by the VE:  ticket marker and courier within a building.  The ALJ included within non-exertional limitations that Dobbs should work in close proximity to coworkers and supervisors so they could monitor him for potential unplanned seizure activity.  Nonetheless, Dobbs avers the job descriptions in the Dictionary of Occupational Titles (DOT) reflect one performs these jobs in relative solitude.

At Step Five, the burden shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform."  *See* 20 C.F.R. § 404.1520(a)(4)(v); *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  For a vocational expert's (VE) testimony to constitute substantial evidence, the ALJ must present a hypothetical question that "comprises all of the claimant's impairments."  *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002).  The claimant must refute the Commissioner's findings that the claimant can perform other work by proving he or she cannot perform the suggested jobs.  *Williams v.*

*Barnhart*, 140 F. App'x 932, 937 (11ᵗʰ Cir. 2005); *Long v. Shalala*, 902 F. Supp. 1544, 1546 (M.D. Fla. 1995) (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11ᵗʰ Cir. 1987)).

"If the ALJ consults a VE, the VE's testimony will constitute substantial evidence if the ALJ 'pose[s] a hypothetical question which comprises all of the claimant's impairments.'" *Jones v. Comm'r of Soc. Sec.*, 423 F. App'x 936, 938 (11ᵗʰ Cir. 2011) (quoting *Jones v. Apfel*, 190 F.3d 1224, 1229 (11ᵗʰ Cir. 1999)).   In addition, "when the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT." *Jones v. Comm'r of Soc. Sec.*, 423 F. App'x at 938 (citing *Jones v. Apfel*, 190 F.3d at 1229–30). In this case, the ALJ posed a hypothetical to the VE comprising all of Dobbs's impairments and non-exertional limitations which he included in Dobbs's RFC in his opinion.   Because the VE used that hypothetical in describing jobs Dobbs can perform, with positions available in the local and national economies, the ALJ's opinion has support in substantial evidence.

## CONCLUSION

Based on the foregoing analysis, the court **AFFIRMS** the Commissioner's decision.   The court will enter a separate order in conformity with this Memorandum Opinion.

**DONE** this 14ᵗʰ day of September, 2018.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE